IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:21cr30 |
| | ) | |
| HENRY GIFFORD ELDREDGE, | ) | |
| Defendant. | ) | |

**Statement of Facts**

The United States and the defendant, **Henry Gifford Eldredge**, stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The United States and **Eldredge** further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.   Introduction**

1. As set forth in greater detail below, beginning at least in or about May 2014 and continuing thereafter through in or about July 2016, in the Eastern District of Virginia and elsewhere, defendant **Henry Gifford Eldredge**, having knowledge of the actual commission of a felony cognizable by a court of the United States—namely, conspiracy to commit wire fraud, major government fraud, false statements, falsification of records, and to defraud the United States—did conceal the same by taking affirmative action to conceal that crime, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States.

2. More specifically, from at least May 2014 through at least July 2016, **Eldredge** knew M.C.M. and K.S. conspired with each other and others to defraud Prime Contractor #2, a

National Aeronautics and Space Administration ("NASA") prime contractor, and in turn NASA and other components of the U.S. government, by, among other things:

    a. fraudulently representing to Prime Contractor #2, the U.S. government (including NASA), and others that Company A was a woman-owned small business ("WOSB") as defined by the Small Business Administration ("SBA");

    b. fraudulently representing to Prime Contractor #2, the U.S. government (including NASA), and others that A.R., the titular head of Company A, owned and controlled Company A on a day-to-day basis, when in fact A.R. did not do so and had fully retired from Company A in or about April 2013; and

    c. fraudulently obtaining approximately $368,120.12 in profits for Company A as a purported WOSB subcontractor on a NASA prime government contract awarded to Prime Contractor #2.

With the knowledge of that felony offense, **Eldredge** did conceal the same by, among other things, approving a fraudulent Company A capabilities statement in or about June 2014 that falsely represented Company A as a WOSB for the purpose of obtaining U.S. government contracting work.

## II. Factual Background

### A. *Company A and Company B*

3. Company A is a Florida corporation that provides various contracting support services at the Kennedy Space Center and Cape Canaveral Air Force Station. Company A was formed in or about 1994 by individuals working for Company B, a Pennsylvania-based company that provides custom fabrication and other services nationwide.

4. In or about 1997 or 1998, **Eldredge**'s employer began to use Company B as a subcontractor. In that capacity, **Eldredge** met M.C.M., one of the sons of L.M., the founder of Company B. In or about 2012, M.C.M. met with **Eldredge** for at least two dinners during which

M.C.M. described Company A. More specifically, M.C.M. told **Eldredge** that because of a monthly management fee that Company A was paying to Company B, Company B could afford to hire **Eldredge** to work for Company B and also help manage Company A from Pennsylvania. M.C.M. told **Eldredge** that M.C.M. wanted to hire **Eldredge** to expand Company A's portfolio of work beyond its work at the Kennedy Space Center. During their conversations, M.C.M. conveyed to **Eldredge** that M.C.M. controlled the day-to-day operations of Company B and that **Eldredge** would report to M.C.M. In or about October 2012, M.C.M. hired **Eldredge**, who began work at Company B as its chief operating officer ("COO").

5. After **Eldredge** began working at Company B, **Eldredge** met A.R., the titular woman owner of Company A, who worked at an open desk in the lobby of Company B alongside its office manager and another individual who did accounting work for both companies. **Eldredge** did not meet A.R. before beginning work at Company B. Within six months of **Eldredge** beginning work at Company B, A.R. retired from both companies in April 2013, after which point A.R. had no regular involvement in either company. Prior to A.R.'s retirement, **Eldredge** participated in multiple conversations about her pending departure from the companies with M.C.M. and others. Those included discussions about shifting A.R.'s responsibilities (which were largely clerical and administrative in nature) to the Company B office manager. In or about April 2013, **Eldredge**, M.C.M., and other Company B personnel attended a modest retirement event for A.R. in a Company B conference room in Pennsylvania.

B. *Government Contracting Preferences for Woman-Owned Small Businesses*

6. The SBA administers several programs designed to help different types of small businesses compete in the American economy through access to the federal procurement market. One of those programs is for women-owned small businesses, otherwise known as "WOSBs." In

order to obtain access to federal government contracting preferences available to WOSBs, a WOSB must be at least 51 percent owned and operated by one or more women, and one or more women must control the company's management and daily operations. In addition, a woman must hold the highest officer position, manage the company on a full-time basis, and devote herself full-time to the company during its normal working hours.

7. Pursuant to the applicable federal regulations, U.S. government prime contractors may rely in good faith on written representations by subcontractors claiming that they meet the criteria outlined above for WOSBs. Moreover, WOSBs may self-represent their status as a qualified WOSB directly to the government, and prime contractors may rely in turn on those self-representations. To self-represent, a claimed WOSB must register in a centralized electronic U.S. government database designed to track such information. From in or about July 2012 to the present, that system was the System for Award Management ("SAM"), administered by the General Services Administration ("GSA"). When a company or individual accesses SAM, either to make certifications or to access certifications made by others, that company or individual accesses GSA servers located in Sterling, Virginia, within the Eastern District of Virginia.

C. *Company A's Use of Claimed WOSB Status to Obtain Government Contracting Work*

8. As noted above, M.C.M. conveyed to **Eldredge** before hiring him that Company A was working exclusively at Kennedy Space Center in Florida on NASA-related projects. After beginning work at Company B and beginning to advise M.C.M. regarding Company A, **Eldredge** learned that Company A's largest subcontract was with Prime Contractor #1, a NASA prime contractor with an office located in Ashburn, Virginia. Together with M.C.M., **Eldredge** attended presentations by Prime Contractor #1 on the status of its work on the prime contract for which Company A served as a subcontractor. During those presentations, Prime Contractor #1 conveyed

4

in M.C.M.'s and **Eldredge**'s presence that Prime Contractor #1 was meeting NASA's subcontracting goals for work provided to WOSBs. During that part of one of those presentations, J.A., a Company A employee, conveyed to M.C.M. and **Eldredge** that Company A helped Prime Contractor #1 satisfy those goals. These presentations by Prime Contractor #1 and statements by the Company A employee were consistent with verbal statements by M.C.M. to **Eldredge** that Company A was a WOSB around the time **Eldredge** began working for Company B. In that timeframe and early in **Eldredge**'s time working for M.C.M., M.C.M. told **Eldredge** that A.R.'s 51-percent ownership share of Company A was sufficient to qualify Company A as a WOSB. Although this was inconsistent with **Eldredge**'s prior experience regarding similar contracting preferences at the state level, **Eldredge** did not further question M.C.M.'s assertions.

9. In or about December 2013, M.C.M. and **Eldredge** conducted a telephonic job interview of K.S. to become Company A's general manager in Florida. During that call, which was led by M.C.M., K.S. asked whether Company A was a WOSB. M.C.M. responded by asserting that Company A was a WOSB until a formal ownership transition to M.C.M. and his brother was completed. M.C.M. subsequently made the decision to hire K.S., who began working as Company A's general manager. A.R. was not involved in any way in hiring K.S., who reported to M.C.M. After K.S. began working at Company A and continuing into the time period set forth below, M.C.M., K.S., and **Eldredge** continued to represent Company A as a WOSB to the U.S. government and U.S. government contractors through at least mid-to-late 2015.

### III. Criminal Conduct

10. On May 14, 2014, M.C.M. emailed a link to an article published by the American Bar Association ("ABA") regarding WOSB requirements to **Eldredge**, K.S., and M.C.M.'s

brother. The article, which **Eldredge** read and discussed both over email and in-person with M.C.M. and K.S., stated, among other things:

> The requirements for control of the WOSB are somewhat stringent, reflecting the legitimate need to guard against firms attempting to qualify for WOSB status when the woman is merely a figurehead for the company. The management and daily business operations of the concern must be controlled by one or more women. This means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more women. Further, a woman must hold the highest officer position in the concern and must have managerial experience of the extent and complexity needed to run the company. The woman who holds the highest officer position also must manage it on a full-time basis, must devote full-time to the business concern during normal working hours, and must not engage in outside employment that prevents her from devoting sufficient time and attention to daily business.

In M.C.M.'s initial email sending the article, he stated, "Researching the WOSB certification status it seems as though we could remain self certified if my wife was made 51% share holder, However, she would have to leave her current job and work full time for the company." This was consistent with prior verbal statements M.C.M. had made to **Eldredge** regarding installing M.C.M.'s wife as an owner of Company A following A.R.'s retirement.

11.     On May 14, 2014, **Eldredge** responded to the above email from M.C.M. regarding the ABA article on WOSB status. **Eldredge** wrote to M.C.M., K.S., and M.C.M.'s brother, "If the article is accurate and the explanations of certification are correct (no reason to believe otherwise), then I think we're on very thin ice as 'self-certified' since [Company A] does not meet the standards for daily business operations controlled by a woman. And, I can't imagine [A.R.] agreeing to become involved in daily operations at this point." **Eldredge** continued, "As I see it, we are at risk for any 'interested party' to challenge the 'self-certified status' if we were to claim it. But, since our [Prime Contractor #1] contract does not indicate [Company A] is a WOSB, I

think the risk is only present if we continue to describe ourselves as 'self-certified.' So, I don't see any advantage to having [A.R.] continue for the next three years, since her involvement in the business isn't sufficient to earn the benefit."

12.  **Eldredge**'s statement in the May 14, 2014, email claiming that the Company A contract with Prime Contractor #1 did not indicate Company A was a WOSB was inconsistent with **Eldredge**'s and M.C.M.'s observations at Prime Contractor #1 meetings discussing Company A's WOSB status, as referenced above. **Eldredge** wrote the statement, however, based on a draft document regarding the Prime Contractor #1 subcontract with Company A that M.C.M. showed to **Eldredge**. That draft document did not have the box checked for WOSB status for Company A. **Eldredge** did not know at the time M.C.M. showed that draft document to **Eldredge** that the actual, signed version of the document did in fact represent Company A as a WOSB. M.C.M. never told **Eldredge** that M.C.M. received the signed version of the document by email in March 2012, prior to hiring **Eldredge**.

13.  Following **Eldredge**'s May 14, 2014, email to M.C.M., K.S., and M.C.M.'s brother, M.C.M., **Eldredge**, and K.S. discussed what to do regarding Company A's representations about WOSB status. Those discussions occurred over time at both regular weekly meetings and otherwise, and occurred both in-person and over the phone. Because M.C.M. controlled both Company A and Company B at that time, M.C.M. led the discussions and made all final decisions. In those conversations, M.C.M. conveyed to K.S. and **Eldredge** that M.C.M. wanted Company A to continue to represent itself as a WOSB until after M.C.M. bought A.R.'s shares in Company A, even though Company A did not actually qualify as a WOSB. In those conversations and his subsequent actions, K.S. conveyed and demonstrated his agreement to continue making that false representation on Company A's behalf and at M.C.M.'s direction.

14. **Eldredge** knew that this direction from M.C.M., and agreement by K.S., would result in material false statements being made both to the U.S. government and to prospective prime contractors with which Company A was seeking work. For example, **Eldredge** knew that companies seeking to do U.S. government contracting work, including as subcontractors, typically certified various statuses, including WOSB status, in the SAM system. **Eldredge** thus knew that M.C.M. had instructed, and K.S. agreed, to represent Company A as a WOSB for any upcoming projects, even though that representation was false. **Eldredge** also knew that U.S. government prime contractors relied on statements regarding statuses like WOSB status in awarding subcontracts to companies like Company A. Specifically, **Eldredge** knew as of May 2014, based on conversations with M.C.M. and K.S., among others, that Company A was planning to bid on a subcontract with Prime Contractor #2 later that year, and that based on M.C.M.'s instruction and K.S.'s agreement, Company A would falsely represent itself as a WOSB on the documentation it submitted to Prime Contractor #2.

15. On June 10, 2014, K.S. emailed a Company A "capabilities statement" to M.C.M., **Eldredge**, and R.G., a Company B engineer. K.S. stated, and **Eldredge** understood, that the capabilities statement was required to do U.S. government contracting work. The capabilities statement was based on a prior version that **Eldredge** had reviewed earlier in 2014. The draft circulated by K.S. on June 10, 2014, stated that Company A was a WOSB. Even though **Eldredge** knew at that time that Company A was not in fact a legitimate WOSB, as he had emailed the prior month to M.C.M. and K.S., **Eldredge** responded on June 20, 2014, to M.C.M. and K.S. that he thought the statement was "solid" and that **Eldredge** "wouldn't change anything except for minor formatting things." In doing so, **Eldredge** took affirmative action to conceal the crimes that he

knew M.C.M. had ordered, and that K.S. would carry out as Company A general manager, in order to continue the false representations of Company A as a WOSB.

16. On June 20, 2014, R.G. responded to **Eldredge**'s email regarding the capabilities statement, copying K.S. and M.C.M., and asked, "Is [Company A] still 'woman owned'?" On June 23, 2014, K.S. emailed in response: "At the moment yes but could change in the very near future." As K.S., M.C.M., and **Eldredge** knew, that statement by K.S. to R.G. was false and misleading because, as M.C.M., **Eldredge**, and K.S. had discussed following the May 2014 email exchange about the ABA article, Company A was not actually a WOSB for government contracting purposes.

17. During July and August 2014, **Eldredge** participated in regular weekly meetings at which Company A business opportunities were discussed. The meetings, which were led by M.C.M. and attended (usually telephonically) by K.S., included discussions of the forthcoming contracting opportunity with Prime Contractor #2. **Eldredge** knew, based on the instructions conveyed by M.C.M. to K.S., that Company A would represent itself as a WOSB in connection with that contracting opportunity. On August 13, 2014, Company A submitted its proposal to Prime Contractor #2. That proposal, which **Eldredge** later reviewed, included forms signed by K.S. and falsely representing Company A as a WOSB.

18. On August 19, 2014, M.C.M. emailed **Eldredge** regarding a question from K.S. about purchasing new equipment. M.C.M. stated that Company A "was drained of $115,000 today for biz transfer. Deal is done." M.C.M. was referring to the sale by A.R. of her Company A ownership shares to M.C.M. and his brother. Although this purchase agreement was not signed until more than 15 months after A.R. officially retired from both companies, and **Eldredge**

9

inquired periodically of M.C.M. regarding why the process took that length of time, M.C.M. never provided an explanation for that timeline to **Eldredge**.

19. In or about September 2014, Prime Contractor #2 awarded the subcontract to Company A. NASA officials approved the subcontract, specifically finding that Prime Contractor #2 was in compliance with prime contract requirements regarding small business subcontracting because Company A "is a WOSB concern." That finding by NASA was based in part on information obtained from accessing K.S.'s representation to that effect in SAM, which Prime Contractor #2 accessed in turn via SAM on or about September 11, 2014.

20. On or about October 12, 2015, K.S. responded by email to an inquiry from Prime Contractor #2 and stated that "[A.R.] who was the 51% owner has informed us she is retiring. [M.C.M. and his brother] are in the process of buying her shares. I believe this transaction will take place over the next three years." This statement was false because, as M.C.M., **Eldredge**, and K.S. knew, A.R. had retired more than two years earlier, and M.C.M. and his brother had bought out her shares prior to Prime Contractor #2 awarding its subcontract to Company A. However, K.S. continued by stating that "[a]s a result, I removed the women-owned status." Thereafter, in or about November 2015, K.S. submitted a revised vendor size status certification form to Prime Contractor #2 that changed Company A's WOSB status to indicate that it was no longer a WOSB.

21. In total, from the time of the contract award through October 12, 2015, Company A received approximately $2,810,774.81 in payments from Prime Contractor #2 on which Company A earned approximately $368,120.12 in profit.

22. On or about July 7, 2016, law enforcement officials executed search warrants at the Company A and Company B premises in Florida and Pennsylvania, respectively. **Eldredge**, who was in Houston, Texas, for work, learned about the searches when K.S. called **Eldredge**. **Eldredge**

also spoke to K.S. after K.S. was interviewed by law enforcement over the phone. **Eldredge** emailed M.C.M. that same day that according to K.S., "the primary subject of the interview was [A.R.] and [Company A] as a woman-owned business." The next day, **Eldredge** forwarded the May 2014 email exchange about the ABA article on WOSB status to M.C.M. and M.C.M.'s brother. **Eldredge** stated, "Here's a message thread from May 2014 that seems to be on point with respect to the validity of [Company A] as a woman-owns small business. Read from the bottom up." After **Eldredge** sent the email, M.C.M. instructed **Eldredge** to run the business and not concern himself with this issue.

23. In or about December 2018, law enforcement contacted **Eldredge** directly for the first time. Prior to that contact, **Eldredge** did not as soon as possible make known the crimes by M.C.M., K.S., and Company A of which **Eldredge** was aware, and that **Eldredge** took affirmative steps to conceal, to any judge or other person in civil or military authority under the United States.

## IV. Conclusion

24. **Eldredge**'s actions in furtherance of these offenses, including but not limited to the acts described above, were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or innocent reason.

25. The foregoing statement of facts is a summary of the principal facts that constitute the legal elements of misprision of a felony. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that would be used to determine **Eldredge**'s sentence under the Sentencing Guidelines. **Eldredge** acknowledges that the foregoing statement of facts does not describe all of **Eldredge**'s conduct relating to the offense charged in this case.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: /s/
Ryan S. Faulconer
Samantha P. Bateman
Assistant United States Attorneys

Defendant's Stipulation and Signature: After consulting with my attorneys and reviewing the above statement of facts, I stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

Henry Gifford Eldredge
Defendant

Defense Counsel Signatures: We are Henry Gifford Eldredge's attorneys. We have carefully reviewed the above statement of facts with him. To our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

David Barger
Michael Engle
Counsel for the Defendant